Good morning, Your Honors, and may it please the Court. My name is Toby Marshall, and along with Beth Terrell for Towsley Brain Stevens, I represent the borrowers. Because there is not enough time today to address each of the issues that is before the Court, I am going to limit my discussion to the topics of personal jurisdiction, standing, and if there is time, table funding. With respect to the remaining issues, I will rest on the briefing, unless, of course, the Court has any questions or the appellees raise any points. These cases really boil down to two things. First, judicial efficiency and the need to protect Washington residents from predatory lending. If the rulings of the District Court are not reversed, the AFSCME defendants will continue to collect usurious interest from Washington homeowners on illegal loan contracts that were entered into and that are secured by real property in this State without ever having to answer in this forum. To hold the AFSCMEs accountable, the borrowers would have to bring dozens if not hundreds of cases around the country to essentially decide the very same issues of fact and law that could be decided in these cases. The borrowers cannot, however, in practical terms, chase these defendants to these distant forums and, therefore, they will really have no recourse for recovering the hundreds of thousands of dollars that have been taken from them. None of these results is condoned by the Supreme Court, the law of this Circuit, or Washington law, and, therefore, the District Court should be reversed. Turning to personal jurisdiction, nearly 50 years ago in the case of McGee v. International Life Insurance Company, the Supreme Court held that for purposes of due process and the exercise of personal jurisdiction, it is proper to hold a nonresident defendant personally accountable, that is, to have personal jurisdiction over the defendant, if the suit arises out of a contract that has substantial connections to the forum state. This holding was upheld in Burger King v. Rudeswitz, where the Court made it clear that the absence of physical contacts does not prevent personal jurisdiction over a defendant. Here these cases are precisely like McGee and Burger King. The suits here arise out of contracts that have substantial connections with the forum state of Washington. These contacts include the fact that the contracts were originated in Washington, the fact that the contracts are with Washington residents, the fact that the contracts are secured by deeds of trust encumbering Washington property, the fact that the contracts are governed by Washington law, the fact that pursuant to the contracts, Washington residents are forced to pay monthly payments, and those payments are drawn on Washington banks. In McGee, the plaintiff was a resident of the forum, the contract was entered into, and the plaintiff mailed monthly payments out of that forum. Though the defendant never entered into California, the Supreme Court held that it was sufficient to exercise personal jurisdiction over the defendant. In Burger King, the real key to the case was the fact that the contract was governed by the law of the forum, which was Florida. The Court held that when a defendant enters into a contract governed by the law of the forum, it purposefully avails itself of the benefits and the protections of that forum's law. You're talking about the personal jurisdiction of the trust defendants, the ultimate purchasers of the paper. Yes, Your Honor. The other persons are already found to have personal jurisdiction. That is correct, Your Honor, because the originators originated the contracts in this State. Aside from though those contacts were sufficient in Burger King and McGee, we have additional contacts here. So we have even more right to personal jurisdiction here, and that's namely the deeds of trust that secure these loans. In this Court's opinion in Scherr v. Johnson, the Ninth Circuit held that a deed of trust is a substantial connection to the forum because the beneficiary of the trust is looking to the laws of that forum to secure its rights. That is precisely what the Assanese are doing in this case. Moreover, Washington has the right to personal jurisdiction over the trust defendants. And the court in Scherr said that, by holding the trust, that is the purposeful – by holding the deed, that's the purposeful availment. In fact, in Scherr, they never even recorded the trust. Here, they've recorded the trust. True, they haven't foreclosed on them, but still, they're essentially using Washington law to enforce their rights under the contract, and they don't need to foreclose   for specific jurisdiction, not general jurisdiction. I am arguing for specific jurisdiction, Your Honor. But when they come to foreclose on a deed of trust, is there anything in the record which indicates that the trust defendants themselves, these Eastern money institutions, come to Washington, or do they simply execute instructions and name nominees who act on their behalf? Well, because they haven't foreclosed on any, I don't think we have any facts that But I think that the key to this is the fact that the assinees are the real party in interest. They're the ones that hold the deeds of trust. They're the ones that hold the notes. If they are to foreclose – I have a question. The record doesn't show one way or the other. Okay. Another important contact here is Washington's interest in protecting its forum – I mean, protecting its citizens by giving them cause for redress in this forum. Everything that happened in this case happened in Washington. The fact that the loans were eventually signed out really doesn't remove the assinees from this forum. In fact, it brings them to here because they purposefully availed themselves. Isn't it important that the citizens who borrow the money in Washington know that their notes are going to be sold downstream to some person's unknown far east of here? To answer your question, Your Honor, I think, no, that's not important. And second of all, that's not the facts of this case. The record – Some do and some don't. Some do and some don't – some do and some don't know? Some of the borrowers do know that their paper is going to be sold and discounted in the east, and some do not know. To be honest, Your Honor, in the factual section under table funding, I believe that we answered that there's really genuine issues on that, that the plaintiffs here really don't know, that they were told basically that the originators were going to go ahead and service their loans. They were told that it's possible they might be assigned out. But that really misses the point, because even if the loans are assigned out, you still have all the contacts. You have the fact that the loans are governed by Washington law. You have the fact that the assinees that do eventually take assignment of the loans are securing their rights by looking to Washington law and holding deeds of trust, essentially, to gather on those loans. The union told the borrowers that in the last four years or so, 100 percent of the other holders, correct? Your Honor, they told them that 75 to 100 percent had been, but they also told the borrowers that 76 to 100 percent chance that it would be assigned out, but the prior performance was 100 percent in the prior year or so. That is correct, Your Honor. But also at the same time, they told the borrowers that they intended to service the loans and that they could do so. So while they were telling them, yes, that they might be assigned out, they were also telling them that they intended to do so. But that really The position is there's no waiver by the citizens on the issue. Absolutely not, Your Honor. What's the difference with their specific jurisdiction of the trust? How is it that the plaintiff here has standing to all these other trusts that have never held notes of the named plaintiffs? Well, that gets to my second point, Your Honor. And really the roadmap for how that occurs was provided by this Court in the Lamar case nearly 30 years ago. And really there are three steps to take when faced with an issue when you have a named plaintiff attempting to assert claims on behalf of a class against some defendants with whom the named plaintiff has had no contact. The first step is to just determine whether the named plaintiff meets the threshold requirements of standing, not with respect to every defendant, but really just with respect to at least one or more defendants, because the whole purpose is to make sure that the Court has subject matter jurisdiction. In Lamar, the Court noted that the named plaintiff did have standing against at least one of the defendants. No one here disputes that the named plaintiffs here also have standing against at least one of the defendants. So the second step, then, is to look at the relationship between the class and the other defendants. And in Lamar, what the Court said was because there's no dispute that the defendants and the class members who are related to each other have cases of controversy, you can assume standing and then move to the next step. Your Honor, you're going too fast for me. There's no evidence here that there was any conspiracy between the trust defendants and the class defendants amongst each other to have brokered usurious loans, allegedly usurious loans, in Washington. What relationship is there between trust A in Philadelphia and trust B in New York? They could come along and they buy some paper from First Plus or from the money store, and they probably haven't even heard of each other. And they certainly don't bid in an open auction. They don't rig the price. What conspirational relationship is there so that a plaintiff who's noted being held by trust A in Philadelphia can sue as a representative of class trust B in New York? We're not alleging that there is any conspiracy, Your Honor, and there doesn't need to be. There are situations in which the conspiracy is the link that combines all the defendants. But the point here is not that the defendants all have to be combined. It's that the defendants all have a relationship to the class members through a central defendant. And actually, I brought a diagram to help illustrate this very point. The term relationship is not the most precise in the world. Tell us what the relationship is. Well, the relationship is really two things. It's factual and it's legal. And if you look at these two cases here, Weiss v. Winter Circle and Moore v. CompEd Savings Bank, which we've briefed, these are decisions in which you have the same sort of issue. And the court held that the named plaintiff could represent the class members against defendants that were not related to the named plaintiff. Now, in Weiss, what you had was Bailey and Associates originated retail installment contracts for all plaintiffs and class members. So everything turned on that case in the blue circle. Fanova, Tamack, and DVL eventually took assignment of those loans, and only Fanova held a named plaintiff's loan contract. So in that case, DVL and Tamack moved to dismiss for lack of standing. And what the court said was that the fact that the case turns, all the legal and factual issues really have to do with that blue circle. And the fact that if Bailey and Associates is liable, DVL is liable, then it's judicially expeditious to bring one suit against all of these defendants. Well, but here we have two different self-styled brokers, right? We have Union and we have AMP. And those two deal with different lenders, maybe intermediate lenders. And those lenders deal with individual trust defendants that are different. So you've got not one spoke of the wheel dealing with all transactions. You've got two spokes of the wheel, and then they break down in different rivulets, if you wish, right? I respectfully disagree, Your Honor. And first, it's important to note that Zocker and Stone are two different cases. These have been consolidated for purposes of this appeal. So the cases really turn on the originator in each case. And I think what Your Honor is getting at is that perhaps, for example, in Union Financial Corp, AQUIN may be, say, the ninth assignee. There may have been other assignees in the chain. The point, though, is that under HOPA, AQUIN stands in the shoes of the originator, regardless of how many assignees are in that chain between the originator and AQUIN. So in these cases, the factual and legal issues turn, for example, on Stone, on whether American mortgage professionals originated usurious loans. If they did, each one of these assignees is liable for the loans that they held or hold that American mortgage professionals originated. And that's the link that you have. It's the strict liability standard that HOPA provides that gives you that link. And the point here really is judicial efficiency. You could bring a separate case for each one of these assignees, but what would you be deciding? You would be deciding whether AMP originated usurious loans. You would be having the same case brought over and over and over to reach the same issues. Really, that's a waste. What we have here is the ability in this forum where the loans were originated to address those issues, which are all in the blue circle. If AMP is liable, so is German American, so is AQUIN, so is GRMT. These are the same cases, really, as Weiss and Moore. Moore and Weiss addressed things a little bit differently. Moore looked at Rule 20. Weiss really looked at Rule 23, in a sense. But the point here is really the same. And if you look back at Lamar, it's true that once the court in Lamar reached the class certification issues, it found that the cases weren't typical.  For example, every pawn shop in Oregon. And not every pawn shop in Oregon was going to be liable for the actions of the one pawn shop that the defendant tried to sue. Here, the names of plaintiffs whose loans are held by first class have the same legal and factual issues as the class members whose loans are held in yellow. Turning to the – unless the court has any more questions on the standing, I will turn to the table funding issue. The purpose of the usury statute is to protect borrowers from predatory lenders and, therefore, cap interest at a 12% usury rate – or a 12% rate. Washington has created a scheme for high-risk borrowers that allows lenders to loan at reduced interest rates. But to do so, the lenders have to subject themselves to the regulations of the state. This allows the state to keep a close eye on the lenders and make sure that they're not taking unfair advantage of the borrowers. The question presented to the court today legally is really, when does a party make a loan? The Washington legislature and the Department of Financial Institutions have both answered that question with the following. Making a loan means closing a loan in a person's name. The loans here were all closed either in the name of American Mortgage Professionals or the name of Union Financial Corps. Because these lenders closed the loans in their own names, they must have been licensed in order to provide interest rates above 12%. They weren't licensed. Therefore, the loans are usurious. The Washington law, as we understand it, or at least I understand it, has a three-part test. One is the money that is being given to the borrower, the money of the broker or the money of the table funder, let's say, the table lender. Second, does the person borrowing the money know the source of the money is not the broker? And third, and I guess it should have been first, was there a preexisting relationship between the broker and the funder, right? What I don't see in the Washington test is what you just described as a requirement of in whose name the loan is closed. And what do you mean by closed? Well, if you look at RCW 31.04.015, the actual definition is making a loan means closing a loan in a person's name, which really means signing the documents in your own name. And that's exactly what happened here. The three-part test that you're speaking of, I would respectfully disagree, is not found in Washington law. It's something that the district court cobbled together from two cases that preceded the Consumer Loan Act. Nevertheless, if you want to look at those three tests, first- You dispute that that's the Washington law? Absolutely, Your Honor. We do- What case do you cite as your best authority for saying the three-part test is not the Washington law? Well, there's no case on point that deals with the table funding situation. Thompson and McCall did not deal with that situation. In Thompson, the contract showed on its face that the payments were going to a third-party lender. In McCall, the borrowers told up front that the third-party lender was really- even though the loan was being closed in the name of the broker, it was really for purposes of this third-party lender. None of those facts happened here. Is it your position, sir, that table funding exception does not exist under Washington law? It may exist under federal law, but not under Washington law? That's absolutely correct, Your Honor. Nevertheless, even if table funding were an exception to the statute, I think if you look at the three-part test that you're talking about, the preexisting relationship is really meaningless. And I submitted a case recently called Moreno v. Summit Mortgage Corporation, where the Fifth Circuit held that if the loan's being closed in the person's name, funded from the lender's own bank account, regardless of the fact that there was a preexisting relationship and the lender agreed to sell that loan immediately, that does not meet the table funding requirements for federal law. And that's exactly what we have going on here. You would supplant the three-part table funding test, as is urged by the Respondents, by the test of was it closed in the broker's name? Yes, period, because that's what- As long as it was closed in the broker's name and he signed the what? Not the promissory note, because that would be signed by the borrower. What does the lender have to sign in order to, quote, close, unquote? Well, I believe the lender does sign the note. If not, the lender's name is at least on the note. It says the borrower- The lender's name is on the note. He's the payee of the note. Exactly. But what does the payee lender sign that constitutes a closing and is determinative under your view? Well, the legislature doesn't give a definition of what closing means. But the point is, is the only people around at this time were American mortgage professionals and union financial. No other name ever came up in all the documents. No other name, but some other money came up. I respectfully disagree. All the checks that were dispersed to the plaintiffs were dispersed from bank accounts for American mortgage professionals and union financial. And in some cases were funded by preexisting deposits by the lenders, some not. I respectfully disagree, Your Honor. I think that we've proven that there's genuine issues of material fact with regard to the timing as well. And that really what you have here is kind of a shadow game where money is being sent out on checks drawn on the originator's loan while other money is being sent across for the purchase in the secondary market of these loans. And I see I'm out of time. All right. You're used up your time, Mr. Marshall. Thank you. May it please the Court, I'm going to divide our time. I've got about 13 minutes, and then Mr. Rodosevich will talk about table funding. And unless the Court would like to ask me something else, I'm just going to focus on standing and personal jurisdiction. But in order to do that, I need to cover a few undisputed facts. I'm sorry, but which defendant or group of defendants do you represent? Well, there's approximately 35 of the non-originating assignees. I'm with the Dorsey and Whitney Seattle office. These trusts? Pardon? These trusts? There's trusts, but there's also some of the non-trusts. And I'm really speaking on behalf of those 35 non-originating assignees. They're intermediates because we have the builder, the lender, and the trust defendant. Right. I'm not speaking for the originators. The originators. You don't represent or speak for Union or A&P, right? That's right. That's fine. Go ahead, please. Okay. These cases arise because of an alleged failure of the two loan originators not to get a license in the State of Washington. If you get the license, you can charge up to 25 percent interest rate. They were licensed brokers, mortgage loan brokers, weren't they? Yes, I believe they were. But I should admit Michelle can tell you. So what happened was these trusts that eventually purchased those loans, they were not even in existence at the point in time that the loans were made by the lenders. And the important thing is that these loans and the securitization of loans is an important thing, holds down mortgage rates. In order to make the mortgage industry work, you have to have something like this. And the testimony of the borrowers has been, look, these were competitive rates, we got good rates, we paid off our higher credit card debts, and we had a tax deduction. So there weren't any complaints. The way these cases arose was someone from a South Carolina law firm came to Washington, searched records, found out that these two were not timely licensed. Doesn't that have to do with personal jurisdiction? That doesn't matter, does it, how it arose? Really, tell us why there isn't personal jurisdiction. All right. Forget the preliminary history. Okay. For personal jurisdiction, let's focus on the four trusts that held loans. And I handed up some diagrams earlier this morning, so hopefully those will be helpful. Right. Those four trusts purchased the loans. They weren't formed at the point in time that the loans were written. They purchased the loans in a large loan pool outside of the State of Washington. They have never done anything in the State of Washington. You're talking about now these first-plus trusts, the numbered trusts, like the 98.2, for instance? Yeah, 98. There's four of them that hold or four trusts that ‑‑ I just want to make sure what you're talking about. Go ahead. Right. There's four trusts that hold loans. And so we're focusing on those because everyone else was out on standing except the originators, and these four trusts did not go out on personal jurisdiction, on standing. But they did go out on personal jurisdiction. And what the court found, the trial court, they did absolutely nothing in Washington. The only thing that was in Washington was a lien on a loan. But the trusts did not do anything about getting the loan payments. There was an independent contractor, in most cases countrywide. There was a loan servicer that got the payments, brought the payments together, consolidated them all. Isn't countrywide acting as an agent for the trust in that respect? No, Your Honor. And I'd focus like on the Kramer case, the Ninth Circuit Kramer case. The documents specifically say it's an independent contractor, not a joint venture, not a partnership. But the more important thing is also the control. There's a contractual relationship, isn't there? Well, there was a contractual relationship, yes. Sure, because countrywide has to make money. Of course. But countrywide had total control. But even the suit ‑‑ You're permitting the proceeds, the balance of the proceeds to the trust, correct? Well, it went to an adventure trustee. But that goes to the trust, doesn't it, at some point in time? No, it goes to an adventure trustee, and then it goes paid off to the certificate holders or the note holders. So the trust never received any benefit? Well, the trusts are set up to ‑‑ they're very complicated, and they're set up to make this loan financing work. But focusing on the personal jurisdiction, in order to have personal jurisdiction, you have to have some contact with Washington. But there has to be some unlawful act or some act that was inappropriate that these trusts did. They did nothing inappropriate in Washington. They weren't in existence. They had nothing to do about not getting those licenses. The only thing they ever did was eventually they had to hire an independent contractor to do the work. There was never any for ‑‑ There has to be something inappropriate to have contact with Washington. Why is it sufficient to do something appropriate, such as pay money for a loan, which is secured by a deed of trust in Washington? Why do you ‑‑ is your position there can't be any personal jurisdiction as to the trust because the trust didn't exist at the time the usurious loans were created? No, no, Your Honor. And when you look at all these personal jurisdiction cases, there's lots of factors you need to look at. But what the cases have said, that holding, even if you hold title to real property, a loan, that's not enough. And what they had here is they did hold the deed, but that's what they did. And that is not enough. And what else did they do? They didn't have any employees here. They didn't have any contact here. They had nothing. So the only thing there was ‑‑ They provided the incentive for the origination of all these loans. They said to ‑‑ they let the word go out to the loan industry in Washington, if you get loans of 17 or 18 percent, we will buy them back east. There will be a source of funds which will take you out of those deals at a benefit to you, the middleman. Right? With all due respect, I don't think there's anything like that on the record. The way it worked is there would be an organization that would put together a pool of loans from all over the country. They funded the loans, right? Pardon? They funded the loans. I mean, they bought the paper, and then they collected the payments. They bought the paper and the loan pools. That's right. And they collected payments from Washington residents. Well, the independent contractor collected the payment, right. Whoever it is. James and Margaret Brown, every month they sent a check to this trust, right? No. To the 98 point something. No, what they did is they sent a check to Countrywide, the loan servicer in California. Then the loan servicer sent money to the indentured trustee. The indentured trustee then sends the money off to the investors in the trust. So you're saying that all the contacts inherent in that relationship aren't sufficient to give rise to a specific jurisdiction over the trust in Washington, right? Yes. Yes. Look at what they're. Are you saying basically that the trust entity itself is nothing more than just a legal fiction? No, it's a real entity. And they're in all but one of them is in Wilmington, Delaware. And it's formed under the Delaware trust laws. And it's a legal. It's made up of these investors. Well, it's a very complicated process. But that's right. It's very similar to a real estate investment trust, right? You can create those certificates on the New York Stock Exchange. Your Honor, I don't know. I don't think so. But I'm not sure. I mean, the ultimate beneficiary, they're just passive investors. Yes. The certificate. I meant those passive investors, ultimately the ones that receive the funds. The investors in the trust receive the funds. Ultimately from Countrywide. Well, it goes from Countrywide to a Countrywide gets it, puts it all together, and then there's a payment. Goes to an indentured trustee. The indentured trustee then pays the ultimate holders of the notes. Okay. What about standing? Well, Your Honor, on standing, there's, in order to have standing, there has to be a case or controversy. There's a lot of cases under Article III. A lot of them start with a Lamar. And they talk about Lamar. And in order to, you have to have a claim against each of the defendants unless there's what they call a juridical link. And in order to have a juridical link, there has to be a horizontal contract, conspiracy, and then there's a group of cases that have, where there's a state statute and state officers or parts of the state uniformly do something. There are contracts here, right? Well, they're vertical contracts, but there are no horizontal contracts. In fact, there's competition between a lot of these entities to get the loans, and there's nothing that's horizontal going on. And what the juridical link says is you have to have something that's horizontal, contract, conspiracy, or there's a state-type exception. And then there was some comments about, well, it just would be easier to manage this. Well, the Lamar case specifically talked about that and said, look, you can't just override Article III jurisdiction because to let somebody sue an industry because you have the manageability problems of large class actions. And the situation we got here is there are individual loans. They've got different rates. There are different people. We're talking to these borrowers. And there were many different steps that went through the chain, and it's a very complicated thing. And the people can get the relief. And remember, what this is, it's purely statutory. There was no damage. Kennedy. Lamar decided that the class action was not certified, right? That's right. And wasn't the reason because there was no common issue of fact in law? Your Honor, what Lamar said is they went right to class, and what it said was when you have a situation where the plaintiff does not have a claim against each defendant, then we cannot have a class certification under Rule 23b-3 because there's not typicality. You have to have each plaintiff, class representative has to have a claim against each defendant that you're going to sue. That's what Lamar said. And they went on to say that that's really necessary because it's going to become a morass if we just let a plaintiff sue an industry. The commonality of questions of fact and law, but not because there was no case of controversy. There's a difference there. Yes, but I believe Lamar went on a case of controversy, that there was no case of controversy between, because what happened there. There was no case of controversy between this plaintiff and these other defendants. Right. What happened in Lamar, there were two different cases put together. One case was there was a plaintiff that did have, had dealt with an airline, but he sued six airlines. And what Lamar said is, well, you don't have any claim against those four airlines. You never did any business with them. The other one was pawnbrokers, and there were thousands of those, and the plaintiff sued the whole industry. And the Court said, you can't do that. You have to have, you can sue people you've dealt with, but you can't sue the whole industry. All right. You're down to about seven minutes. All right. Let me talk a little, then, about these cases. Mr. Co-Counselor, you're taking your time. I told you, you're down to seven minutes. Oh, I thought, all right. Excuse me. Thank you. Good morning, Your Honors. My name is Michelle Radosevich from Davis Wright Tremaine. I'm here representing TMS Mortgage, but I'm speaking on behalf of both the loan originators and the immediate assignees of those loans. And my subject is, as you know, table funding. I'd like to start by addressing the contention that plaintiffs were making this morning that making a loan is defined in the statutes. First of all, the definition that they're referring to in the statutes was passed in 2001, long after these cases were filed. And moreover, the operative section of 3104, the Consumer Loan Act, that deals with usury, does not use the term making a loan at all. That particular section of the statute uses lending money rather than making a loan as the operative term. And if you take a look at the session law, which is actually an appendix to our brief, if you take a look at the session law, you'll see that the parts of the statute that deal with excessive fees and the relationship between brokers and lenders. And why don't you tell us your theory about why I think you believe table funding has been adopted by the state of Washington as a concept. Okay. First of all, I'm not sure. Isn't that your position? Yes, it is. Well, a very close proximity there, too. The table funding argument dovetails with existing Washington common law. Existing Washington common law has interpreted for a long time the usury statutes, and they have tried to always rely upon the substance of the transaction rather than the form of the transaction, the reason being obvious, that the form of the transaction can be manipulated and controlled. Well, is there a Washington case that recognizes the concept of table funding in order to determine who the lender is? The Washington, yes, actually. The Washington, they predate table funding, and they don't use the term table funding. But the Washington cases, McCall v. Smith, that is cited in our brief, as well as Thompson v. with table funding. And they don't use assignment per se, which table funding does, but they actually look at who bore the risk, whether there was, you know, an assignee who was actually lined up for the loan. Let me ask you this. Why isn't there a real dispute here about whether or not the originators actually funded the loan? Okay. I mean, you read the documents and you read the representations in their applications. I mean, there's all kinds of hints here that they were making the loans. That's right. And they may have made some loans. We don't know. I think the trial court found in one instance, at least, that there was a question of the issue of fact over whether or not. Correct. I forget the union, I forget who it was. Correct. Or not union. It was AMP, but. They actually funded the loan. Correct. The reason that there isn't is you have to kind of track the paperwork and look at it carefully. But in the Zachar case, you can compare the matching funding confirmations from union and Empire and the wire transfer, and they all agree that the date is September the 10th. The fact that the check says September the 8th is pretty meaningless. You can prepare a check and let it sit for several days. When is the check delivered? We don't know. Doesn't that create an issue of fact? No, Your Honor, because it's clear that, well, actually we do know when it's delivered. I'm sorry. I misspoke. We know that it's delivered on the 10th by the fact that the funding confirmations, I mean, that is what is being confirmed in the funding confirmations. It is dispersal to the borrower that is being confirmed at that point. And so we have matching funding confirmations, and we have a wire transfer that all match in the Zachar case. And the Zachars, if they, I mean, on summary judgment, they had the perfect ability to come forward with some of their own records. If, in fact, they had received the loan prior to that point, they would have had credit card statements showing the payoff. They would have had bank statements showing deposits. None of those were brought forward. In the Zorro case, we actually have a letter to Mr. Zorro delivering the check. Enclosed is the check with the proceeds of your loan. And that check is dated on August the 13th. I might add it was mailed, so the disbursement to Mr. Zorro probably didn't actually occur until even later than that. But the August 13th date is exactly the date that matches the wire transfer. Let's take Zachar. Okay. $40,000 loan with checks drawn on September 8th, 1997. Right. Union received a $40,000 wire transfer from Empire on September 10th, two days later. Right. There is no evidence in the record that I could find of when Union actually delivered the checks to Zachars, other than the checks themselves. No. With all due respect, Your Honor, at ER-268 and 269 are the matching funding confirmations from Union Financial to Empire? ER-268 and 269? Correct. Go ahead. Matching confirmations? Yeah. In other words, they have to – the originator has to tell the buyer of the loan or the assignee of the loan what the funding date is, because they're going to be the ones servicing the loan. So that document that they send is called a funding confirmation, and it tells you what day the loan is funded. And in the case of the Zachars, there's a corresponding confirmation back again kind of saying, yes, we got that, and yes, the date is September the 10th. The Zorro case is actually more complex, because Union Financial managed to send the funding confirmation to TMS a day before the date that it actually says they're funding the loan. So it's prospectively guessing that they're going to disperse the loan on the 8th of August, but that didn't happen, because we've got the letter enclosing the check that's dated the 13th. We've got Mr. Zorro testifying. He remembers nothing unusual about that. He probably got the check along with it. That matches the wire transfer date in that case. And if you read our briefs and track this very carefully, you'll see that the evidence really does exist in the record. And I would also point out that the borrowers, Mr. Zorro is an attorney. Borrowers could have. I've turned to 268 and 269. Okay. These are confirmations that Empire has funded as of September 10th and bought the Zachar loan.  I think, Your Honor, that it also is the – and actually, if you go two more pages forward, I think that there's another document. The 10th of – their first payment is due on the 10th of October. About two more pages further on. It could be three pages further on in the – Your payment is due 10-10-97. Right. Which, again, indicates that they believe that the disbursement date was the 10th of – that everybody is working off a 10th of September disbursement date. Because there's also – The due date of an instrument does not necessarily mean the date upon which the borrower received his or her funds. True? But in these cases, there is generally – from which a reasonable person could find only one way that the funding occurred on September 10th rather than September 8th. And if so, I'll give you a second shot. Give me the citation. I can't give you the citation. But – wait a minute. But there is a letter telling borrowers that their first payment will be due 30 days after the disbursement date. And I'm sorry that I can't give you the actual site, but it's there. And the inference is the loan was funded on that date. The 10th. Which is 30 days before the due date of the payment. Correct, Your Honor. You can see you're way over your time. I can. Thank you, Your Honor. All right. We thank all counsel. This case is now submitted for decision. Next case on the argument calendar is Burton versus State Farm Auto Insurance. I was going to take a recess before we get to Burton. So we'll have a recess at this time. Thank you.
judges: Tashima, Paez, Bea